United States District Court
District of Maine

| | | |
|---|---|---|
| Steven D. Day, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Docket No. |
| | ) | |
| Sappi North America, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## Complaint for Discrimination and Retaliation
## Injunctive Relief Sought and Demand for Jury Trial

Plaintiff Steven D. Day complains against Defendant Sappi North America, Inc. (Sappi) as follows:

### Summary

1.  In September 2017, Sappi made a permanent job offer to one of four temporary maintenance workers at its Somerset Mill. They chose a 34-year-old with only three years of paper mill experience. And they did not hire Steven Day, a 54-year-old who had almost 30 years of experience working at the Madison Paper mill until it closed in 2016.

2.  After a thorough investigation, the Maine Human Rights Commission (MHRC) unanimously found reasonable grounds to believe that Sappi discriminated against Mr. Day because of his age.

3.     The MHRC found it particularly probative of discrimination that Sappi's written performance evaluation of Mr. Day showed that he was rated by both his supervisors and coworkers as a much better worker—including in performance, attitude, and teamwork—than the 34-year-old who got the job.

4.     For example, one Commissioner who formerly worked in Human Resources at Sappi found it telling that "there was such a disparity [in the performance evaluations] between who was hired and who wasn't" and that the performance evaluations showed that Mr. Day excelled at the job.

5.     The much younger employee received a dismal performance review, including that his greatest challenges were "doing a good job" and "working with other people." By contrast, Mr. Day earned a superior evaluation including that he does a "great job, "cleans bathrooms better than anyone," "finds work to do," and the "crew likes him."

6.     In February 2021, after the MHRC ruled that Mr. Day was unlawfully discriminated against when he was not hired in 2017, Sappi finally offered Mr. Day a job, which he gladly accepted.

## Parties

7.     Plaintiff Steven Day is a resident of Madison, Somerset County, Maine.

8.     Defendant Sappi North America, Inc.[1] ("Sappi") is the North American subsidiary of Sappi Limited, a global pulp and paper company headquartered in Johannesburg, South Africa. Sappi provides dissolving pulp, packaging, specialty papers and graphic papers, as well as biomaterials and biochemicals to a global customer base.

9.     Sappi is headquartered in Boston, Massachusetts and has established places of business in Westbrook, Cumberland County, Maine, and Skowhegan, Somerset County, Maine.

## Jury Trial Demand

10.     Under Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues triable by a jury.

## Jurisdiction and Venue

11.     This action arises under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (ADEA), the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634 (MHRA), and the Maine Whistleblowers' Protection Act, 26 M.R.S. § 831-840 (MWPA). This Court has proper subject matter jurisdiction over Mr. Day's federal claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and supplemental jurisdiction over Mr.

---

[1] As explained in Sappi's Answer to Mr. Day's MHRC Complaint, before August 28, 2018, Sappi North America, Inc. was named S.D. Warren Company d/b/a/ Sappi North America.

Day's state law claims under 28 U.S.C. § 1367(a) because they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

12.     Venue is proper in the District of Maine under 28 U.S.C. § 1391(b) because (1) Sappi operates two large paper mills in the District of Maine and is subject to the court's personal jurisdiction there, and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in the District of Maine.

13.     Under Rule 3(b) of the Rules of this Court, this action is properly filed in Bangor because "a substantial part of the events or omissions giving rise to the claim occurred" in Somerset County, Maine.

## Facts

14.     Mr. Day was born on February 11, 1963, and is 58 years old.

15.     Mr. Day grew up around the paper industry in Madison, Maine. His father and two of his uncles worked in the paper mill when he was growing up, just as his grandfather and great grandfather had. Mr. Day saw working in the paper industry as his family's calling, and he wanted to follow in their footsteps.

16.     Mr. Day graduated from Skowhegan Area High School in 1981 and then served in the Maine Army National Guard. He earned the 262 Engineer Battalion "Soldier of the Year" award in 1983. He graduated from the Army's Non-Commissioned Officer Academy and completed phase one of Officer Candidate School.

17.     In 1988, Mr. Day began working at Madison Paper's mill in Madison, Maine, and he worked there for close to 30 years until the mill closed on about July 16, 2016.

18.     In 1993, Mr. Day earned an Associate's Certificate in Pulp and Paper from Kennebec Valley Community College.

19.     During his time at the Madison mill, Mr. Day consistently received promotions for his hard work and excellent work record. For example, in about 2010-2011, Mr. Day was promoted to the Back Tender position, which is the second highest paid production job.

20.     Then in early 2013, Mr. Day began filling in as a Machine Tender, the highest paid production job at the mill. And he received a permanent promotion to the Machine Tender position in early 2016.

21.     Mr. Day was the Leader of the Behavioral Safety Network at Madison for more than 15 years. In that capacity, he helped to coordinate safety trainings and discussions for employees and made suggestions for safety improvements at the mill.

22.     Mr. Day received positive feedback from his supervisors and coworkers during his time at the Madison mill, and he never received any discipline.

23.     Before Madison Paper announced its plan to close, Mr. Day's supervisor spoke with him about training for a "step up" Crew Supervisor position, in which Mr. Day would be called to fill in as Crew Supervisor as needed.

24.     Madison Paper first announced its plan to close the mill in about March 2016. Soon after that, representatives from Sappi's Somerset Mill in Skowhegan made a presentation to all Madison Paper employees at their workplace encouraging them to apply for positions with Sappi.

25.     Mr. Day applied for a full-time year-round production position at Sappi during the spring of 2016, when he was 53.

26.     Mr. Day's application included positive letters of reference from his managers at Madison Paper, including the Mill Manager, the Manager of Finishing, Technical Customer Service, and Business Development, and Mr. Day's direct supervisor.

27.     The Mill Manager's letter of reference praised Mr. Day for doing "the simple expected items perfectly, meaning he comes to work on time and prepared, works well and is respected by others, and focuses on his and his coworkers safety." He also stated that Mr. Day "learns quickly, utilizes what

he's learned to improve operations, and is free to share that knowledge with others."

28.    The Mill Manager described Mr. Day as "a low key leader on his crew that coworkers and supervisors utilize to assist in setting direction for the days operations." He concluded, "Steve is not afraid to work and is well equipped to manage challenges at a new company in a new position."

29.    The letter of reference from Mr. Day's direct supervisor stated, "Steve's skill and dedication to the job was not matched by any other employee that I worked with at Madison paper." The supervisor praised Mr. Day's "work ethic and desire to lead by example for his fellow workers," and described how he was able to rely "heavily" on Mr. Day "for machine runnability and crew direction" because "Steve was always aware of everything going with the equipment and continued to look for areas of improvement."

30.    He described how "Steve always took the initiative to learn his job and many others without direction as well as took part in any developmental projects that were being done," and stated that "[h]is commitment to safety and being a safety leader was also very impressive." Mr. Day's supervisor concluded, "My only regret is that I was not able to take him with me into my next mill."

31.     The Finishing Manager's letter of reference praised Steve for doing an "excellent job" in the Machine Tender position. He stated that one of Mr. Day's "strong points" was paying "close attention to the details," including "thorough rounds of his operation, understanding the process, meticulous housekeeping, etc."

32.     He praised Mr. Day for his "strong commitment to safety" and stated that the thing that impressed him the most about Mr. Day was "his passion for high individual and organizational standard. He understands the connection between individual commitment to the operation, and the ultimate success of that operation."

33.     Another Madison Paper supervisor told Mr. Day that, after Madison Paper announced it was closing, the supervisor was given a roster of names by the Mill Manager and was asked to rate the listed workers from 1-5. The supervisor told Mr. Day that he gave him the highest rating of 5.

34.     In August 2016, Mr. Day was interviewed by Sappi for the production position.

35.     Sappi notified Mr. Day on about September 8, 2016, that it had decided not to hire him.

36.     During January and February 2017, Mr. Day applied again to Sappi for employment. One application was for a summer temporary (temp) position and the other was for a permanent supervisory position.

8

37.     Sappi did not interview or hire Mr. Day for the supervisory

position.

38.     On February 28, 2017, Sappi HR Director John Barker asked a

former HR Director from Madison Paper for information about Mr. Day.

39.     The former HR Director quickly responded the same day stating:

> Steven Day is a good operator and was a good employee. He
> was not shy about offering his opinions regarding the
> operation, but always did so in a respectful manner.
> Although we are not supposed to give recommendations,
> you can probably guess where I'm coming out on Steve.
> Steve was heavily involved in our Behavioral Safety
> Program and took a strong leadership role in promoting the
> methodology. If you are doing something that is putting
> yourself or others at risk, and he witnesses it, he will step
> up and let you know, and explain why he is doing so.

40.     Later the same day, February 28, 2017, Sappi HR Generalist

Cayla Tozier requested feedback on a list of candidates from Mr. Barker,

Charles Qualey, and Edward Glasheen, all of whom had met and interviewed

Mr. Day. Mr. Day was at the top of Ms. Tozier's list.

41.     Mr. Glasheen responded that he was not impressed by Mr. Day

because he and the other candidates "have had time in a papermill." Instead,

he asked, "What about the kid that worked at Pine tree camps? Is he on the

list? I would take a try on him as he seemed to have a good attitude and a

want to learn."

42.     At the end of February or in early March, about 20-25 other former Madison Paper employees were offered summer temporary positions, but Sappi notified Mr. Day that it had decided not to hire him for a 2017 summer temporary position.

43.     Sappi did hire "the kid that worked at Pine Tree camps," who was in his early 20s and did not have any relevant paper mill experience, for a summary temporary position, and he was later hired for a full-time position at Sappi.

44.     In mid-April 2017, Sappi belatedly offered Mr. Day a summer temporary position. He was the only employee offered a position at that time.

45.     Mr. Day began working at Sappi on May 15, 2017.

46.     Despite Mr. Day's many years of experience in production, he was assigned to the Maintenance Services Department.

47.     Mr. Day's direct supervisor was Gerald "Gerry" Khiel.

48.     Mr. Day was older than many of the summer temporary employees working at the mill.

49.     On July 18, 2017, Mr. Khiel met with John Barker and Cayla Tozier from Human Resources to do an "Hourly Probationary Period Review" of Mr. Day. Mr. Khiel gave glowing feedback about Mr. Day, including that:

- He "cleans bathrooms better than anyone";

- He "gets the job done" and then "finds work to do";

- He "communicates" well;

- The "crew likes him";

- He "has come up with safety improvements for the scale house"; and

- He is doing a "great job."

50.     When asked what Mr. Day's greatest challenge was, Mr. Khiel said he didn't "see anything right now" that was a challenge for Mr. Day. And when he was asked if there were any "red flags" around Mr. Day's performance, he said that there were none.

51.     Mr. Khiel also filled out a written performance review form for Mr. Day. He rated Mr. Day at least "Meets Expectations" in every category. In the category of "Working Together: cooperates with co-workers and management to meet business goals," Mr. Khiel rated Mr. Day as "Outstanding," which was described as "exceptionally cooperative, proactively establishes and maintains good relationships with co-workers and management."

52.     Even where Mr. Khiel rated Mr. Day as "Meets Expectations," he highlighted on the form behaviors from the "Outstanding" description that were demonstrated by Mr. Day. For example, in the "Quality of Work" category, he highlighted "Reliable results. Looks for ways to improve quality. Does not make errors. Requires little checking" from the "Outstanding"

11

description, in addition to highlighting "Meets Expectations—Meets quality standards and expectations."

53.     In other categories, Mr. Khiel highlighted "consistently uses discretionary time in value added way," "requires little follow-up," "able to learn quickly and contributes toward meeting department goals," "identifies possible hazards and makes corrective suggestions," and "consistently follows all safety rules."

54.     Mr. Khiel later admitted in an affidavit submitted to the MHRC that his review of Mr. Day's performance was "above average."

55.     On July 27, 2017, Mr. Khiel received an email from another supervisor thanking Mr. Day and two other Maintenance Services workers for their help refilling a sand filter. He described how this was "a very labor intensive task done with total cooperation and a great attitude. Not to mention completed in half the time originally estimated." He asked Mr. Khiel to "[p]lease pass on the appreciation."

56.     One of Mr. Day's tasks as a summer employee was cleaning the employee water coolers. When Mr. Day and his coworkers were trained to do this task, they were directed to use a solution of warm water and a little bit of bleach to make sure to kill the bacteria and algae that grows in the coolers.

57.     After about a month of cleaning the coolers that way, Mr. Khiel notified Mr. Day and his coworker that some employees had complained that

the water tasted like bleach, and he chastised them for using the diluted bleach solution to clean the coolers, even though they had been trained to do so.

58.    Mr. Khiel told them that, from now on, they should use boiling water to clean the coolers instead of the warm water and bleach solution. In response, Mr. Day explained that, because the coolers do not fit in the break room, where the sink and stove are, they are usually cleaned in an employee work area. He reported his concern that it would be unsafe to carry a pot of boiling water from the break room through an area where employees were working because he or someone else could get hurt if the boiling water spilled while it was being transported.

59.    Mr. Khiel dismissed Mr. Day's safety concerns and told Mr. Day and his coworker that he still wanted them to use boiling water. They agreed to do so, and they carefully used boiling water to clean the coolers for the rest of the summer.

60.    In September 2017, Sappi began deciding which of the summer temporary employees to hire for permanent positions at the mill.

61.    According to Sappi, there were 19 available permanent positions and 29 total summer temporary employees.

62.    Mr. Khiel was asked to recommend one employee from the four temporary employees in Maintenance Services for permanent hire.

63.     At the Fact-Finding Conference during the MHRC proceedings, Sappi HR official Tozier testified that supervisors were directed to consider only employees' summer performance and did not base their decisions on other factors like education or experience.

64.     Despite his very positive performance review of Mr. Day, Mr. Khiel did not recommend Mr. Day for hire and instead recommended a 34-year-old employee with significantly less papermaking experience than Mr. Day.

65.     The much younger employee that Mr. Khiel chose instead of Mr. Day had received a very negative probationary performance review in July 2017, including the following comments:

- He "doesn't find work to keep busy – waits for direction"

- His greatest challenge is "working with other people" and "doing a good job rather than just say[ing] he can do [a] good job."

- He received negative feedback "from crew" because he is "quick to assign blame" and "would throw others under the bus and they know that."

- A "red flag around performance" was that he "did a bad job on waxing floors – poor quality" and then "threw others under the bus – didn't take the blame."

14

66.     There were no positive comments on the younger employee's evaluation other than that he had good attendance and "work[s] safely."

67.     Like he did for Mr. Day, Mr. Khiel also filled out a written performance evaluation of the younger employee. But unlike Mr. Day's evaluation, Mr. Khiel rated the younger employee only "Meets Expectations" in every category, and he did not highlight any of the "Outstanding" criteria. In the "Working Together" category, he did not even highlight all of the "Meets Expectations" criteria and wrote next to it: "discuss this." At the bottom, he wrote that the employee was "quick to assign blame" and "doesn't find new things on his own."

68.     In the MHRC case, Sappi gave several vague, inconsistent, and shifting justifications for choosing the younger employee over Mr. Day.

69.     Mr. Khiel testified in an affidavit that he did not recommend Mr. Day because, after the mid-summer review, he started noticing unspecified "issues with Day."

70.     Sappi stated at the Maine Human Rights Commission meeting that "the problem with Mr. Day was that he had worked in a paper mill for 30-plus years," and so he acted like the job was "beneath him" and had a "negative attitude about cleaning the bathrooms."

71.     But at the end of the summer, Mr. Khiel described Mr. Day as "positive, quiet, no negative feedback," and he did not raise any concerns

15

about Mr. Day's attitude or performance. And he stated in Mr. Day's mid-summer performance review that "he cleans bathrooms better than anyone."

72.    At the August 2020 MHRC meeting, when asked what specifically Mr. Day did that demonstrated a negative attitude, Sappi responded that Mr. Day "had a negative look on his face," but was unable to point to any other specific examples.

73.    Mr. Khiel also testified in the affidavit that the much-younger employee "wanted to improve his performance" after the mid-summer evaluation and "made continual improvements over the remainder of the summer."

74.    But that much-younger employee worked for only about two weeks after his dismal late July performance evaluation.

75.    Based solely on Mr. Khiel's recommendation, Sappi decided to hire the much younger employee instead of Mr. Day.

76.    Mr. Day was not offered a position at the end of his summer temporary job. Instead, he received a letter from HR Generalist Tozier mailed on Friday, September 29, 2017, notifying him of the end of his employment on September 20, 2017, and stating that Sappi had decided not to hire him for any of its "immediate openings."

77.    Mr. Khiel was also asked to recommend one employee from the other department he supervised: Stores and Receiving. The employee he

16

recommended from that department, and who was ultimately hired, was 36 years old.

78.     Mr. Day made one more application for full-time production work with Sappi, on November 19, 2017.

79.     On December 13, 2017, HR Generalist Tozier notified Mr. Day by email that his "profile [did] not fully match [the] current vacancy."  At about this same time, Sappi offered full-time year-round production jobs to about 12-15 other individuals.

80.     Upon information and belief, most of the people hired in December 2017 instead of Mr. Day were younger than him, had never worked at Sappi, or had significantly less paper mill experience than him.

81.     Not being hired at Sappi and losing his identity as a fourth-generation papermaker caused Mr. Day to lose his self-confidence and sense of purpose. It also caused him to become demoralized and less motivated, and to develop insomnia.

82.     Not being hired by Sappi damaged Mr. Day's reputation as a competent papermaker. He was embarrassed and humiliated when he saw his former Madison and Sappi colleagues, many of whom had been hired by Sappi in permanent jobs and treated him like something was wrong with him because he was not hired.

83.     After looking hard for a new job but being out of work for nearly a year, in August 2018, Mr. Day was hired at the Verso paper mill in Jay. This new job paid less than Sappi and was at least an hour commute (more in inclement weather) from his home in Madison.

84.     Mr. Day's 45-day evaluation at Verso at the end of 2018 was very positive, with a number of "above expectations" and "outstanding" scores. He was particularly praised for his "initiative" because he "[a]lways stays busy" and for his "ability to work with others" because he "gets along with everyone."

85.     Likewise, on his 2020 performance evaluation, he received at least "meets expectations in every category," and received "exceeds expectations" in "works productively without direct supervision and does quality work," and "voluntarily assists other team members with issues. Shares skills and knowledge." He was praised for being a "good worker," giving his "best" to "new challenges," "jump[ing] in and help[ing]," and being "very helpful and calming to some people." In the area for comments, his supervisor wrote, "Steve can help you see the glass is ½ full instead of ½ empty."

86.     In October 2020, because of his lack of seniority, Mr. Day was laid off from Verso as part of a reduction in their workforce.

87.     In February 2021, after the MHRC Commission found reasonable grounds to believe that Sappi had discriminated against Mr. Day because of his age, Sappi offered Mr. Day a job. Mr. Day accepted the position and successfully began working at Sappi.

## Administrative Procedure

88.     On July 19, 2018, Mr. Day filed a complaint against Sappi with the MHRC and Equal Employment Opportunity Commission (EEOC) for subjecting him to unlawful employment discrimination including age discrimination and retaliation under the MWPA.

89.     On August 11, 2020, the MHRC issued a Statement of Finding that Defendant discriminated against Mr. Day on the basis of age.

90.     On October 14, 2021, the EEOC adopted the MHRC's finding.

91.     On November 9, 2020, the MHRC issued a notice of failed conciliation and notice of right to sue.

92.     On October 14, 2021, the EEOC issued a notice of right to sue.

93.     On February 4, 2021, the parties agreed in writing to toll all limitations periods, including the periods for filing court actions under the MHRA and the ADEA, as of February 2, 2021. That tolling agreement was terminated by Defendant, effective November 10, 2021.

94.     Under 5 M.R.S. § 4622, Mr. Day has satisfied one or more of the prerequisites to be awarded attorney's fees and all available damages under the MHRA and the MWPA.

95.     Mr. Day has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

## Legal Claims

96.     The allegations in paragraphs 1-95 are realleged.

97.     Mr. Day's legal claims are based on the following adverse actions: (1) Defendant Sappi's notice to Mr. Day by a letter mailed to him on Friday September 29, 2017, that it had decided to terminate his employment and not to hire him for any of its "immediate openings;" and (2) when it notified Mr. Day on December 13, 2017, that it was denying his November 19, 2017, application for full-time production work. All earlier adverse actions are alleged solely as background evidence to support the claims based on these two adverse actions.

98.     Sappi intentionally discriminated against Mr. Day because of his age in violation of the ADEA and MHRA.

99.     Sappi intentionally retaliated against Mr. Day for his protected whistleblower activity, described in paragraphs 58-59, in violation of the MHRA and the MWPA.

100.   Mr. Day is pursuing all possible methods of proving discrimination and retaliation, including but not limited to, circumstantial and direct evidence, pretext evidence, as well as but-for causation based on a single unlawful motive or discriminatory factor and mixed motives or factors, including an unlawful motive or discriminatory factor.

101.   As a direct and proximate result of Defendant's intentional age discrimination, Mr. Day has suffered and will continue to suffer damages, including, but not limited to, back and ongoing pay and benefits; loss of self-confidence and self-respect; humiliation and embarrassment; emotional pain and distress; suffering;, inconvenience; mental anguish; loss of enjoyment of his job and of his life; injury to reputation; other noneconomic losses; and other past and future pecuniary losses.

Thus, Plaintiff requests relief against Defendant, as follows:

(a)   Enter declaratory relief that Defendant violated Mr. Day's statutory civil rights to be free of age discrimination and whistleblower retaliation;

(b)   Enter injunctive relief ordering Defendant to:

- provide effective civil rights training for all human resources employees and all supervisors at the Somerset Mill on the requirements of all applicable laws prohibiting employment discrimination because of age and retaliation under the MWPA,

and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

- provide this training for two years after the date judgment is entered to all new human resources and supervisory employees within 60 days of their starting the position;

- maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

- post at the worksite a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief; and

- send a letter printed on Defendant's letterhead to all of Defendant's employees at the Somerset Mill advising them of the judgment in this case, enclosing a copy of their policies regarding anti-discrimination and retaliation, and stating that they will not tolerate any such discrimination or retaliation, and will take appropriate disciplinary action against any employee or agent of Defendants who engages in such discrimination.

(c)     Enter injunctive relief ordering Defendant to provide Mr. Day with all terms of employment restored as if he had been hired in September 2017;

(d)     Award back pay for lost wages and benefits;

(e)     Award under the ADEA liquidated damages in an amount equal to twice the amount of unpaid wages and benefits;

(f)     Award compensatory damages under the MHRA in amounts to be determined at trial by the jury, or nominal damages;

(g)     Award punitive damages under the MHRA in amounts to be determined at trial by the jury;

(h)     Award full costs and reasonable attorney's fees;

(i)     Award pre-judgment interest; and

(j)     Award all further relief that is appropriate.


Date: November 10, 2021                    Respectfully submitted,


                                           /s/ Shelby H. Leighton
                                           Shelby H. Leighton
                                           Johnson, Webbert & Garvan, LLP
                                           160 Capitol Street, P.O. Box 79
                                           Augusta, ME 04332-0079
                                           Tel: (207) 623-5110
                                           sleighton@work.law

/s/ David G. Webbert
David G. Webbert
Johnson, Webbert & Garvan, LLP
160 Capitol Street, P.O. Box 79
Augusta, ME 04332-0079
Tel: (207) 623-5110
dwebbert@work.law

*Attorneys for Plaintiff*